**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RAYMOND KASAK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 06 C 5119** |
| | ) | |
| **v.** | ) | **Magistrate Judge Morton Denlow** |
| | ) | |
| **VILLAGE OF BEDFORD PARK and** | ) | |
| **LEO J. DuBOIS, Individually,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Raymond Kasak ("Plaintiff" or "Kasak") filed a three-count complaint against Defendants Village of Bedford Park ("Bedford Park") and Chief Leo J. DuBois ("Chief DuBois" or "Defendant DuBois") (collectively, "Defendants"). Counts I and III of the First Amended Complaint were previously dismissed, leaving Plaintiff's political retaliation claim (Count II) as the only remaining count. *Kasak v. Village of Bedford Park,* 514 F. Supp. 2d 1071 (N.D. Ill. 2007).

In April of 2008, Plaintiff filed a Second Amended Complaint, asserting his political retaliation claim as Count I and adding a procedural due process claim as Count II. Defendants have moved for summary judgment on Plaintiff's political retaliation claim, Count I.[1] For the reasons stated below, the Court grants Defendants' motion to dismiss Count I of Plaintiff's Second Amended Complaint.

---

[1] At the time Defendants filed this motion, the Court had not yet granted Plaintiff leave to file his Second Amended Complaint. Thus, Defendants' motion as written moves for summary judgment on Count II of Plaintiff's First Amended Complaint. In light of Plaintiff's Second Amended Complaint, the parties agree that the present motion now addresses Count I of Plaintiff's Second Amended Complaint. Dock. No. 115, May 6, 2008.

# I. DEFENDANTS' MOTION TO STRIKE AND DEEM ADMITTED PORTIONS OF PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT LOCAL RULE 56.1 STATEMENT OF FACTS IN SUPPORT OF SUMMARY JUDGMENT AND PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF ADDITIONAL MATERIAL FACTS

Defendants have moved to strike and deem admitted portions of Plaintiff's Response to Defendants' Joint Local Rule 56.1 Statement of Facts in Support of Summary Judgment and Plaintiff's Local Rule 56.1 Statement of Additional Material Facts.

## A.     Local Rule 56.1

The Northern District has promulgated Local Rules 56.1(a) and 56.1(b) to delineate the parties' obligations in summary judgment proceedings, and the Court has broad discretion to enforce these rules. *Malec v. Sanford,* 191 F.R.D. 581, 583 (N.D. Ill. 2000) (also stating that "the Court of Appeals for the Seventh Circuit regularly upholds strict enforcement of Local Rule 56.1").[2] Rule 56.1(a)(3) requires the movant to submit a statement of undisputed material facts that entitle him to judgment as a matter of law. *Id.;* N.D. Ill. L.R. 56.1(a). The nonmovant must respond to the movant's statement of facts, and may also submit a statement of additional facts. *Malec,* 191 F.R.D. at 583; N.D. Ill. L.R. 56.1(b). The response must contain "a response to each numbered paragraph in the moving party's statement," mirroring the movant's statement in form and "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Malec,* 191 F.R.D. at 584; N.D. Ill. L.R. 56.1(b). Thus, the nonmovant must cite evidentiary

---

[2]This Court uses *Malec* as "a vehicle to inform lawyers appearing before this Court what precisely we expect from summary judgment practitioners." *Malec,* 191 F.R.D. at 582.

materials justifying any denial. *Malec,* 191 F.R.D. at 584. "If the cited material does not clearly create a genuine dispute over the movant's allegedly undisputed fact, the nonmovant should provide an explanation." *Id.* A nonmovant's response should also not contain purely argumentative denials. *Id.* If a nonmovant fails to properly respond to a movant's 56.1(a) statement, the movant's factual allegations are deemed admitted. *Id.*

The requirements for the nonmovant's statement of additional facts under Rule 56.1(b)(3) (c) are the same as that of the movant's statement of facts under Rule 56.1(a)(3). *Id.* The nonmovant's "statement of additional facts must set forth material facts that require the denial of summary judgment, supported by specific references to the record." *Id.;* N.D. Ill. L.R. 56.1(b)(3)(c). The statement must contain only factual allegations, supported by specific references to exact pieces of the record that support the factual contention contained in the paragraph. *Malec,* 191 F.R.D. at 584. Such references must "include page (or paragraph) numbers, as opposed to simply citing an entire deposition, affidavit, or other exhibit document." *Id.* ("District Courts are not obliged . . . to scour the record looking for factual disputes;" "Factual allegations not properly supported by citation to the record are nullities."). Moreover, any "documents submitted with a motion that are not referred to in the statement of facts will be ignored." *Id.*

A nonmovant may use innumerable types of evidentiary material to support a statement of facts, however the most common include affidavits, deposition transcripts and business documents. *Id.* Any allegations supported by personal knowledge only, however, must be supported by affidavit. *Id.* Additionally, the evidence supporting the allegations

must represent admissible evidence. *Id.* at 585 ("a hearsay statement made during a deposition does not constitute adequate evidentiary support for a factual proposition").

**B.      Defendants' Motion to Strike Certain Portions of Plaintiff's Responses to Defendants' Joint Rule 56.1 Statement of Undisputed Facts**

Defendants move this Court to strike certain portions of Plaintiff's Responses to Defendants' Joint Rule 56.1 Statement of Undisputed Facts, based on Plaintiff's inclusion of argumentative detail and new affirmative facts into several of his responses. Defendants also assert that certain portions should be stricken because Plaintiff has improperly cited to the record for support of his particular denials, improperly requiring the Court to scour the filings for this alleged support. In particular, Defendants move to strike Plaintiff's responses to Paragraphs 10, 12, 14-26, 29-30, 32, 35, 38, 41, 44-46, 50 and 57. For the following reasons, the Court grants in part and denies in part Defendants' motion.

**1.      The Court Grants Defendants' Motion to Strike Plaintiff's Responses to Paragraphs 10, 12, 14, 16-20, 23-26, 29-30, 32, 38, 44-46 and 50.**

The Court grants Defendants' Motion to Strike Plaintiff's Responses to Paragraphs 10, 12, 14, 16-20, 23-26, 29-30, 32, 38, 44-46 and 50. Several of these responses contain improper denials, with no citation to the record to support the denial or statement that the information cited to by Defendants does not support the alleged facts. In most of these responses, Plaintiff merely denies the statements without providing any explanation or citation to the record, while also improperly injecting new factual material into the

responses.[3] Although Plaintiff is entitled to submit new factual material in his statement of additional facts, injecting such facts into his responses is inappropriate. Moreover, in some of the responses, Plaintiff merely provides too general a citation, improperly requiring the Court to scour those records to find support for Plaintiff's response. *See* PR ¶ 20, 45-46.[4] For Plaintiff's Response to Paragraph 50, although he appears to properly deny the facts by giving additional statements to contradict the fact that Robison had no knowledge of what Plaintiff did for his campaign, the page that Plaintiff cites to for support of these statements has not been provided to the Court. Without evidence to support the statements that Plaintiff puts forth to contradict Defendant's statements, the Court cannot resolve this disputed fact in Plaintiff's favor. Thus, for these reasons, the Court grants Defendants' Motion to Strike the above responses, and deems them admitted.

---

[3] The Court notes that for most of these responses, the evidence Defendants' cite to for support for their statement supports the facts as stated by Defendants. Thus, even if the court accepted these responses, it would still find that the facts as stated by Defendants' are accurate.

[4] Citations to the record are in the following form: Defendants' Joint Local Rule 56.1(a)(3) Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment is cited as DSOF ¶ ___; Plaintiff's Response to Defendants' Joint Local Rule 56.1(a)(3) Statement of Undisputed Material Facts in Support of Defendants' Motions for Summary Judgment is cited as PR ¶___; Plaintiff's Statement of Additional Material Facts is cited as PSOF ¶ ___; Defendant DuBois' Response to Plaintiff's Statement of Additional Material Facts is cited as DBR ¶ ___; Defendant Bedford Park's Response to Plaintiff's Statement of Additional Material Facts is cited as BPR ¶ ___; Defendants' Exhibits in Support of Motion for Summary Judgment is cited as Def. Ex. ___; Plaintiff's Exhibits in Support of His Response to Defendants' Motions for Summary Judgment is cited as Pl. Ex. ___; and Defendant Bedford Park's Supplemental Exhibits in Support of its Motion for Summary Judgment is cited as Def. Supp. Ex. ___.

## 2. The Court Grants in Part and Denies in Part Defendants' Motion to Strike Plaintiff's Responses to Paragraphs 15, 21-22, 35, 41 and 57

Plaintiff appears to properly deny portions of Paragraphs 15, 21-22 and 57 by providing citations to the record to support his denials. However, Plaintiff improperly injects additional facts into these responses as well. The Court strikes the portions of Plaintiff's responses that include this additional factual material, but accepts the portions of the responses that state Plaintiff's denial and the supporting evidence for that denial. In Plaintiff's responses to Paragraphs 35 and 41, Plaintiff also properly denies the statements, by providing support for his denial. Although he injects new facts into his response to Paragraph 41, he does so for the purposes of denying the statement that "Robison had no formal campaigning." Although the Court does not accept these additional statements as facts to be included in this motion, it allows them as support for Plaintiff's denial of Defendants' statement. Thus, the Court grants in part and denies in part Defendant's Motion to Strike the above responses.

## C. Defendants' Motion to Strike Paragraphs 41-67 of Plaintiff's Statement of Additional Facts

Defendants argue that Plaintiff violated Local Rule 56.1(b)(3)(c) by filing 27 additional statements of material uncontested facts without seeking prior leave of Court. Local Rule 56.1(b)(3)(c) states that a party responding to a motion for summary judgment may file "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." The Rule further provides that "absent prior leave of

court, a respondent to a summary judgment motion shall not file more than 40 separately numbered statements of additional facts." The moving party is limited to filing no more than 80 numbered statements of facts. L.R. 56.1. The Committee Comment to the Rule provides additional background on the purpose for this requirement:

> The judges of this Court have observed that parties frequently include in their LR 56.1 statements facts that are unnecessary to the motion and/or are disputed. The judges' observation is that in the vast majority of cases, a limit of 80 asserted statements of fact and 40 assertions of additional statements of fact will be more than sufficient to determine whether the case is appropriate for summary judgment. The number of statements of fact has been set in light of the requirement of section (a)(3), which requires that only "material facts" be set down. A party may seek leave to file more asserted statements of fact or additional fact, upon a showing that the complexity of the case requires a relaxation of the 80 or 40 statement limit.

L.R. 56.1, Committee Comments. Thus, a Court may refuse to consider statements of fact in excess of the number permitted by Local Rule 56.1, particularly where the number of statements filed far exceeded the number permitted, and where the additional facts were immaterial to the motion. *See Green v. Harrah's Illinois Corp.,* 2004 WL 1102272 (N.D. Ill. 2004) (refusing to consider statements of material undisputed fact in excess of the number permitted by L.R. 56.1).

In this case, Plaintiff has filed 27 statements of fact in excess of the number prescribed without permission from the Court. Without waiving any rights with respect to their motion to strike, Defendants admit 16 of those statements. Because the additional number of facts are not so excessive, and the Court is not required to spend significant resources to resolve disputes surrounding the undisputed facts, the Court accepts those additional undisputed facts.

However, the Court grants Defendants' motion as to the remaining 11 disputed facts. The Court notes that, although some of the disputed facts are material to Plaintiff's claims, the acceptance of these additional facts in Plaintiff's favor would not change the Court's ruling on Defendants' motion for summary judgment. Accordingly, the Court grants in part and denies in part Defendants' Motion to Strike Certain Paragraphs of Plaintiff's Local Rule 56.1 Statement of Additional Material Facts.

## II. BACKGROUND FACTS

The following facts are undisputed or presented in the light most favorable to Plaintiff when contested.[5]

### A. Relationship Between the Parties

Plaintiff has been employed as a police officer by Defendant Bedford Park, an Illinois municipality, for 23 years. PR ¶ 2, 6. Plaintiff does not live in Bedford Park and does not vote in Bedford Park municipal elections. PR ¶ 39. At all relevant times, Defendant DuBois was Bedford Park's Chief of Police and Plaintiff's supervisor. PR ¶ 3.

In 1987, Plaintiff was promoted from the rank of patrol officer to the rank of sergeant, and in 2001, he was promoted from sergeant to lieutenant. PR ¶ 7, 8. Plaintiff served as supervisor in the juvenile division of the police department for eighteen years until he was removed from that position on April 30, 2004. PR ¶ 9.

### B. Plaintiff's Position as Supervisor of the Juvenile Division

_____

[5]As to paragraphs 41-67 of Plaintiff's Supplemental Statement of Facts, the Court has included all undisputed facts (both those which Defendants' have absolutely admitted and those which Defendants' have admitted that the cited testimony reflects the facts as stated), and has omitted all disputed facts.

Records are maintained in the juvenile division in both a computer data-base and a paper filing system. PR ¶ 11. As supervisor, Plaintiff's duties included making certain that juvenile file data was accurately entered into the department's computer system, and that paper files were maintained properly. Def. Ex. 1 at 153-54.

## 1.    Fall 2003

On October 29, 2003, Village President Ronald Robison, Village Attorney Gryczewski, Trustees Regep, Ploszek, and Kensik, Police Chief DuBois, and Deputy Chiefs Moritz and Wahl attended a meeting with Police Officers Flint, Mokos, and Faulhaber regarding the upcoming sergeant's promotional examination. Pl. Ex. 1, 3; Pl. Ex. 4; Def. Supp. Ex. 1 at 274.[6]

Sometime prior to the October 29, 2003 meeting President Robison informed Chief DuBois that the Bargaining Unit had threatened to go to the newspapers and submit a "Letter of No Confidence" to the Village Board. Pl. Ex. 5, at 67-70. Defendant DuBois believed that the "Letter of No Confidence" would have informed the Village Board that the Bargaining Unit members had no confidence in him as an administrator and may have recommended his termination. BPR ¶ 7; DBR ¶ 7. President Robison had many differences with Chief DuBois during his time as president, and would have "taken it very seriously" had a "Letter of No

---

[6]On October 5, 2003, Bargaining Unit Representative Phil Tennerelli, submitted a letter to Village President Ronald Robison requesting a meeting with Village officials regarding the upcoming sergeant's promotional examination. Pl. Ex. 1; Def. Supp. Ex. 1 at 274. On October 7, 2003, President Robison notified Phil Tennerelli that a meeting would be scheduled, and on October 15, 2003, Village Administrator Nisavic informed Officer Flint and Officer Mokos that a meeting would take place on October 29, 2003. Pl. Ex. 1; Pl. Ex. 2.

Confidence" been tendered to him. Pl. Ex. 6 at 36. While President, Robison removed the Fire Chief and the Deputy Fire Chief from their positions and reassigned them in the department. Pl. Ex. 6, at 38-39. Within five days after the October 29, 2003 meeting, Plaintiff and Defendant DuBois participated in a "heated discussion" in which Defendant DuBois expressed to Plaintiff his belief that there was an attempt being made to have him removed from his position as Chief, as was done to the Fire Department Chief. Pl. Ex. 7 at 100-01.

Sometime in the fall of 2003, Deputy Chief Wahl became aware of what he believed to be record-keeping problems in the juvenile division under Plaintiff's supervision. BPR ¶ 13; DBR ¶ 13. Prior to the October 29, 2003 meeting, Defendant DuBois, as Chief of Police for 16 years and Deputy Chief of Police for two years, had never evaluated or reviewed Plaintiff as a juvenile officer or as the supervisor of the Juvenile Division. Pl. Ex. 5 at 72. During his 18 years as a supervisor in the Juvenile Division, Plaintiff had never been questioned about the condition in which he kept the juvenile department records, nor had he ever received a request for a juvenile record that Plaintiff was unable to satisfy. Pl. Ex. 7; Def. Supp. Ex. 1 at 274. BPR ¶ 16, 17; DBR ¶ 16, 17. Moreover, at no time during his eighteen years as supervisor of the Juvenile Division did Plaintiff fail to meet a deadline to provide required monthly and/or quarterly reports concerning juvenile files. BPR ¶ 18; DBR ¶ 18.[7]

---

[7]And at no time during Plaintiff's eighteen years as supervisor did Defendant DuBois receive any information or complaints regarding the handling of juvenile retail theft offenders from the Federal Agency awarding grants to the Bedford Park Police Department for a juvenile retail theft diversion program. BPR ¶ 19; DBR ¶ 19. At no time while Plaintiff was supervisor did Defendant DuBois ever have a problem with the way Plaintiff handled a juvenile victim nor did he ever receive a complaint from the State's Attorney's Office regarding Plaintiff's processing of juvenile matters. BPR ¶ 21, 22; DBR ¶ 21, 22. Defendant DuBois has no documentation of ever receiving a complaint from a parent or juvenile regarding how Plaintiff handled a specific juvenile incident during his eighteen years as the supervisor of

Defendant DuBois never expressed his expectation for computer record-keeping in the juvenile division in writing or verbally to anyone in the Department, including Plaintiff, nor had DuBois ever told Plaintiff prior to his removal from office what his expectations were regarding data entry in the juvenile division. BPR ¶ 66; DBR ¶ 66.

## 2. Spring 2004 - Plaintiff's Removal from Juvenile Division Supervisor Position

Around April 30, 2004, Deputy Chief Wahl conducted a follow-up review of the records that caused him concern in the fall of 2003 in the juvenile office, and on April 30, 2004, after DuBois was advised of deficiencies in the state of the juvenile department record-keeping, Plaintiff was removed as Juvenile Division Supervisor. BPR ¶ 24, 25; DBR ¶ 24, 25; Def. Ex. 2 at 270-71. Plaintiff was ordered to turn over all documentation, files, and other items of import relating to the juvenile division to Sergeant Peter Raineri, who assumed his position. BPR ¶ 26; DBR ¶ 26.

Defendant DuBois appointed Sgt. Raineri to replace Plaintiff as supervisor and to conduct an inquiry into Plaintiff's handling of the juvenile files. PR ¶ 13; BPR ¶ 30; DBR ¶ 30. At the time he issued the assignment to Sgt. Raineri, Defendant DuBois knew that Plaintiff and Sgt. Raineri had a strained and contentious relationship ever since Raineri was removed from the juvenile division at Plaintiff's recommendation in 2001.[8] BPR ¶ 31; DBR

the Juvenile Division. BPR ¶ 23; DBR ¶ 23.

[8]In 2001, approximately three years prior to Defendant DuBois' appointment of Sgt. Raineri to replace Plaintiff, Defendant DuBois had stripped Sgt. Raineri of his juvenile officer title and duties upon a recommendation by Plaintiff, who was then the supervisor of the office. BPR ¶ 27; DBR ¶ 27. In his eighteen years as supervisor of the Juvenile Division, Plaintiff only recommended that one juvenile

¶ 31.

### 3.    Spring - Fall 2004 - Investigation into the Juvenile Division records

Shortly after Sergeant Raineri was appointed supervisor of the juvenile division in May of 2004, Deputy Chief Wayne Wahl directed him to inspect the state of the records in the juvenile division.  DSOF ¶ 14; Def. Ex. 3 at 9-13; Def. Ex. 7 at 11. In conjunction with his review, Sergeant Raineri examined every computer record and paper file in the juvenile division for the years 2000 through 2004. PR ¶ 15. He looked in each case file or incident report and determined what information was required in the database, and prepared his findings in a report and spreadsheets. PR ¶ 15; Def. Ex. 3 at 13; Def. Ex. 6 at 15-16; Pl. Ex. 7 at 136-37.  DuBois did not issue Sgt. Raineri any written directives, but simply informed Sgt. Raineri, verbally, that he wanted an investigation into Plaintiff. BPR ¶ 33; DBR ¶ 33.

### a.    Sergeant Raineri's 2004 Memos

On May 3, 2004, Sgt. Raineri submitted his first memo to Defendant DuBois regarding his investigation into the 2004 juvenile files. BPR ¶ 34; DBR ¶ 34. On June 2, 2004, Sgt. Raineri submitted his second memo to Deputy Chief Wahl, with a copy to Defendant DuBois, regarding his investigation into the 2002 and 2003 juvenile files. BPR  ¶ 35; DBR  ¶ 35.  On July 14, 2004, Sgt. Raineri submitted his third memo to Deputy Chief Wahl, with a copy to Defendant DuBois, regarding his investigation into the 2002 and 2003 juvenile files. BPR ¶

---

officer, Sgt. Raineri, ever be stripped of his title and duties. BPR  ¶ 28; DBR  ¶ 28. Plaintiff recommended that Chief DuBois remove Raineri from the Juvenile Division because he believed Raineri had violated the Illinois Juvenile Code. BPR ¶ 29; DBR ¶ 29. Following the recommendation of Plaintiff, Defendant DuBois stripped Raineri of his title and duties as a juvenile officer. BPR  ¶ 29; DBR  ¶ 29.

36; DBR ¶ 36.

On September 8, 2004, Sgt. Raineri submitted a memo to Deputy Chief Wahl, with a copy to Defendant DuBois, regarding his investigation into the 2001 juvenile files. BPR ¶ 37; DBR ¶ 37. On September 13, 2004, Sgt. Raineri submitted a memo to Deputy Chief Wahl, with a copy to Defendant DuBois, regarding his investigation into the 2000 juvenile files. BPR ¶ 38; DBR ¶ 38.

## C.    April 5, 2005  - The Bedford Park Municipal Election

The Bedford Park municipal election took place on April 5, 2005. PR ¶ 37. The incumbent Village President, Ronald Robison, formally declared his candidacy in January of 2005. PR ¶ 40. His opponent, Village Trustee David Brady, also declared his candidacy in January of 2005. PR ¶ 42.

There were no political parties in Bedford Park, nor did any debates or fundraisers take place. BPR  ¶ 41; DBR  ¶ 41.   Campaigning in Bedford Park historically consisted of preparing an introductory letter and delivering the letter to the Village residents in person. BPR ¶ 41; DBR ¶ 41. As a matter of custom, there were no campaign signs, advertisements, or paid campaign workers. BPR  ¶ 41; DBR  ¶.

Neither candidate did anything more than hand out an informational flyer and speak with residents. BPR ¶ 41; DBR ¶ 41. Robison campaigned by distributing a letter to Village residents and attending a forum at the Village Library. PR ¶ 41; Def. Ex. 5 at 7-10, 13-14, 20. Brady did not do any campaigning prior to January of 2005.  PR ¶ 43. Brady's campaign consisted of two letters sent to Village residents, visiting some Village residents at their

homes and participating in the candidate's forum at the Village library. PR ¶ 43.

In the months leading up to the April 2005 mayoral elections, President Robison gave Plaintiff a campaign flyer, knowing that Plaintiff's aunt was a Village resident and an active senior, Plaintiff's brother was a former Village Trustee, and Plaintiff had many years of dealing with Village residents as a Police Officer. BPR ¶ 39; DBR ¶ 39. Gaining the votes of one family in Bedford Park is important and can determine the outcome of a political election in the Village. BPR ¶ 42; Pl. Ex. 14 at 15.

Plaintiff verbally expressed his support for Robison in the police department and in other social situations, including Fraternal Order of Police meetings, and at other various times. BPR ¶ 40; DBR ¶ 40; Pl. Ex. 7 at 215-16. Brady won the April 2005 election by 20 or 22 votes and assumed the role of Village President several weeks later. PR ¶ 44; Pl. Ex. 13 at 15; BPR ¶ 44; DBR ¶ 44.

Defendant DuBois had heard that Plaintiff supported President Robison before the 2005 election, and was aware that Plaintiff supported Robison during his prior terms as Trustee and Mayor. Pl. Ex. 5 at 283. Village policy prohibits employees from engaging in political activity while at work. PR ¶ 58. On April 5, 2005, Plaintiff was assigned to the 3:00 p.m. to 11:00 p.m. work shift. BPR ¶ 47; DBR ¶ 47. Defendant DuBois ordered Plaintiff, the shift supervisor, to stay out of the Village for this shift. BPR ¶ 47; DBR ¶ 47. Plaintiff was not allowed to enter the area in his jurisdiction that is assigned 1/3 of the Police Department's patrol manpower.[9]

---

[9](The shift supervisor is responsible for the entire Village of Bedford Park, which is made up of three beats or areas. The "Village" is the only residential area. The other two beats or areas consist of industry and retail establishments. The only polling location is in the "Village." BPR

BPR ¶ 47; DBR ¶ 47.

**D.** **The April 7, 2005 Report and the December 9, 2005 Report**

On April 7, 2005, two days after the election in which President Robison was defeated, Sgt. Raineri submitted a memorandum to DuBois advising him that he had completed his review of the cases assigned to the juvenile office in the year 2000 and attached spreadsheets from 2001 through 2005. BPR ¶ 49; DBR ¶ 49; PR ¶ 16. Raineri's April 7th report indicated that more than 100 juvenile cases from the years 2000 through 2004 had not been entered into the juvenile database until after Sergeant Raineri took over as juvenile supervisor in 2004. PR ¶ 16. His report also noted a lack of follow up on cases, as well as issues relating to the paper filing system including a failure to use file folders and a failure to record case dispositions. PR ¶ 16. Sergeant Raineri tendered his report on April 7, 2005, not because anyone told him to tender it then, but because that is how long it took him to go over the files. PR ¶ 17.

In the fall of 2005, Chief DuBois asked Sergeant Raineri to go over his report again to make certain that it was accurate. PR ¶ 18. Sergeant Raineri, once again, compared every juvenile file against the information contained in his report. PR ¶ 19.

Around this same time, because of citations that were issued on December 8 and 9, 2005, Plaintiff was charged with conduct unbecoming a member of the Police Department for improperly ordering the issuance of snowfall parking citations and misleading Detective

¶ 47; DBR ¶ 47.).

Lincich about his authority to do so.[10]  BPR  ¶  52; DBR  ¶ 52. No other members of the

Department were subject to any discipline, including the shift supervisor in charge at the time

the citations were issued and the officer who issued the citations. BPR  ¶  52; DBR  ¶ 52.

Sergeant Raineri also completed the second review of the records on December 9, 2005,

when he filed his final report. PR ¶ 19 His report chronicled a host of pervasive and endemic

record-keeping deficiencies in the juvenile division from January 1, 2000 through May 1, 2004

while under the supervision of Plaintiff.[11] PR  ¶  20.

------

[10]In the evening hours of December 8, 2005, and the early morning hours of December 9, 2005, more than six inches of snow fell in the Village of Bedford Park. BPR  ¶  50; DBR  ¶ 50. Between the hours of 11:00 p.m. on the 8th and 7:00 a.m. on the 9th, nineteen parking citations were lawfully issued in accordance with the Village's Snowfall Parking Ordinance 10-12-23. BPR  ¶  50; DBR  ¶ 50. The parking citations were issued in accordance with the Village Ordinance. BPR  ¶  50; DBR  ¶ 50. Village President Brady received a call at his place of employment from a Village secretary advising him that residents had received tickets and that Plaintiff was involved. BPR  ¶  51; DBR  ¶ 51. Brady also received telephone complaints at his home from Village residents regarding the parking tickets. BPR  ¶  51; DBR ¶ 51. Chief DuBois was not at the police department on December 9, 2005, so Brady requested that Deputy Chief Moritz investigate the issuance of the parking citations. BPR  ¶  51; DBR  ¶ 51.

[11]As set forth in the report, from January 1, 2004 through May 1, 2004, 31 complaint numbers were assigned to the Juvenile Division, but none had been entered into the computer system until Sergeant Raineri took over in May of 2004. Def. Ex. 8A. No file work was completed on 27 of the 30 cases assigned in 2004 until he took over as juvenile supervisor. DSOF ¶ 21; PR  ¶  21. Three of the 30 files had been faxed to the State's Attorney for assignment to retail theft diversion class prior to Raineri taking over as supervisor, but no computer entries had been made with respect to these files. DSOF ¶ 21; PR ¶ 21. There were 82 case numbers assigned to the juvenile unit. Def. Ex. 8A. 43 of the 83 incidents were entered into the computer system after Sergeant Raineri took over as supervisor in May of 2004. PR ¶ 22. No cases were entered into the computer database at all from January 1, 2003 through April 28, 2003. DSOF ¶ 22; PR ¶ 22. Eighteen of the paper files created in 2003 had no file jacket. PR ¶ 22. As further set forth in the report, in 2002, 94 cases were assigned to the juvenile unit, and 50 of the 94 cases were not entered into the computer system until Sergeant Raineri took over as juvenile supervisor in 2004. PR ¶ 23. No computer entries were made at all from August 1, 2002 through April 28, 2003. PR ¶ 23. In 2001, 72 cases were assigned to the juvenile unit. PR ¶ 24. Eleven of the 72 cases were not entered into the computer system until Sergeant Raineri took over in 2004. PR ¶ 24. Forty-eight of the 72 cases had no dispositions noted on the files. PR ¶ 24. Eight juvenile cases from the year 2000 were not entered into the computer database until Sergeant Raineri took over as juvenile supervisor. PR ¶ 25. Sergeant Raineri's report also documented a lack of follow-up with respect to the juvenile files, general disorganization in the juvenile office, and a failure to follow chain of custody procedure with respect to

## E. Ordinances Governing Police Department

The duties and responsibilities of the Bedford Park Police Chief are set forth in the Village ordinances which provide that "the department shall be under the control and supervision of the police chief, who shall be the executive officer of the police department." PR ¶ 56. The Ordinance further provides that the Chief shall be responsible to the president and the board of trustees for the efficient operation of the Department, and that the Chief's responsibilities for dealing with demotions shall conform with the provisions set forth in the personnel ordinance. PR ¶ 56. The Village of Bedford Park personnel ordinance contains a policy relating to appeals of employee disciplinary actions. Pl. Ex. 19, Ord. 1-18-6(D), Ord. 1-18-8(D)(1)(c)(1). Pursuant to the policy, suspensions or demotions may be appealed. PR ¶ 57. If appealed, "the village board, including the village president, . . . render[s] a final decision as to the grievant's petition." Pl. Ex. 19, Ord. 1-16-8(D)(1)(c)(1).

## F. Disciplinary Charges Against Plaintiff

In January of 2006, Defendant DuBois brought three disciplinary charges against Plaintiff, one of which was based upon his failure to properly maintain the records in the Juvenile Division from 2000 through 2004. PR. ¶ 27. Defendant DuBois conducted a pre-disciplinary hearing on the charges on February 3, 2006. PR ¶ 28. After the pre-discplinary hearing, Chief DuBois sustained the charge for failure to maintain the records in the Juvenile Division for the years 2000 through 2004, but dismissed the other two charges. DSOF ¶ 29; PR

---

seized items and evidence. PR ¶ 26. The December 9, 2005 memo included Appendix B which lists more than fifteen Department Rules and Regulations, Policies and Procedures, with no specific reference to which of those Plaintiff may or may not have violated. BPR ¶ 56; DBR ¶ 56.

¶ 29.[12]

Following the pre-discplinary hearing, Chief DuBois demoted Plaintiff from the rank of Lieutenant to the rank of patrol officer for his failure to maintain the records in the Juvenile Division for the years 2000 through 2004. DSOF ¶ 30; PR ¶ 30.

Plaintiff appealed the disciplinary action to the Village Board of Trustees. PR ¶ 31. The Village Board conducted a hearing on the matter on March 27 and 30, 2006. PR ¶ 32. Plaintiff was present at the hearing and represented by counsel, but chose not to testify on his own behalf. PR ¶ 32. Plaintiff did not offer any evidence or argument to the Village Board that his demotion had been politically motivated. PR ¶ 32.

The Village President and the Board of Trustees unanimously upheld Plaintiff's demotion. PR ¶ 33. The Village President, David Brady, sent a letter to Plaintiff on May 4, 2006, which contained the Village's written findings regarding Plaintiff's discipline. PR ¶ 34.

---

[12]One of the charges (as described in paragraph 58 of Plaintiff's Additional Statement of Facts) was withdrawn after the pre-disciplinary hearing because of the testimony elicited from Officer Woods. BPR ¶ 61; Pl. Ex. 5 at 45-46. One of the charges (described in paragraph 52 of Plaintiff's Statement of Facts) was withdrawn after the pre-disciplinary hearing because of the testimony elicited from four police officers named and presented by Plaintiff to testify as witnesses on his behalf. BPR ¶ 53; DBR ¶ 53. On December 2, 2005, Officer Woods expressed her displeasure with the way in which her radio communications were not being promptly answered, and she expressed her displeasure to Plaintiff, who was her shift commander on the date of the incident. BPR ¶ 57; DBR ¶ 57. Plaintiff advised that he would handle the situation, which involved radio communications operator Meilicke, the daughter of former Village President Robison. BPR ¶ 57; DBR ¶ 57. Adrienne Svetich, the supervisor of the radio communications operators who had been appointed by Defendant DuBois to her position, requested that Officer Woods write a memorandum detailing the incident so that discipline could be enacted on three separate occasions after Officer Woods returned to work from time off. BPR ¶ 58; DBR ¶ 58. On December 20, 2005, Officer Woods was finally "bullied" by Svetich into writing a memo detailing the incident. BPR ¶ 59; DBR ¶ 59. Woods never expressed her displeasure with the way Plaintiff handled her complaint, nor does she feel Plaintiff was responsible for her dissatisfaction with the way her complaint was resolved. BPR ¶ 59; DBR ¶ 59.

The Village President and the Board found that Plaintiff failed to maintain the juvenile records from 2000 through 2004; that he failed to adequately ensure that officers in the Juvenile Division followed record-keeping procedures; that the department supervisor's investigation was thorough, fair and impartial; and that the discplinary action imposed was justified and warranted.[13] PR ¶ 34. The members of the Village Board of Trustees who voted to uphold the disciplinary action were Constantine Toulios, Gail Rubel, Dan Nisavic, and Village President, David Brady. PR ¶ 47.

## G.      Plaintiff's Political Retaliation Claim

Plaintiff claims there is a connection between Sergeant Raineri's April 7, 2005 report regarding the records in the Juvenile Division and the April 5, 2005 election for Village President.  He contends he was demoted because of his support of the outgoing Village President Ronald Robison. PR ¶ 36, 45.

Plaintiff has no evidence of Defendant DuBois ever telling anyone that Plaintiff was demoted for political reasons. PR ¶ 55. There is no evidence that Plaintiff's support of Robison was considered by or influenced the Village Trustees when they voted to sustain Plaintiff's demotion from Lieutenant to patrol officer. PR ¶ 46.  Robison had no specific knowledge of what Plaintiff may or may not have done in support of his campaign, other than perhaps speak to his aunt. DSOF ¶ 50; Def. Ex. 5, at 17, 19, 27-28.

At the time that Village President Brady, Village Trustee Toulios, and Village Trustee Nisavic voted to uphold the disciplinary action, they had no knowledge that Plaintiff had

---

[13]The primary reasons that Mayor Brady voted to uphold the discipline imposed by Chief DuBois were the deficiencies in the data-entry, the delays of years in making some entries, and Plaintiff's failure to adequately ensure that other officers in the Juvenile Division followed proper record-keeping procedures, and Plaintiff's own failure to present any evidence to rebut the charges against him. Pl. Ex. 13, at 40-42, 45-46.

supported Robison in the 2005 mayoral election.[14] PR ¶ 48, 51, & 52. Village Trustee Rubel, who voted to sustain Plaintiff's demotion, was aware that Plaintiff had supported Robison in the 2005 mayoral election, but Rubel herself had supported and voted for Robison in the election.[15] PR ¶ 53.

## III. LEGAL STANDARDS

A court may grant summary judgment when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). The movant bears the burden of establishing that there exists no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir. 1995). The party bearing the burden of proof on an issue at trial may not rest on the pleadings, however, but must "designate specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324. The evidence is viewed in the light most favorable to the non-movant and "all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255.

## IV. DISCUSSION

Plaintiff alleges that Bedford Park demoted him in 2006 in retaliation for his political

---

[14]Village President Brady presided over Plaintiff's post-discplinary hearing in March of 2006 and voted to sustain Plaintiff's demotion to patrol officer. PR ¶ 48. Brady never saw Plaintiff do any campaigning for his opponent, Ronald Robison. PR ¶ 49.

[15]Village Trustee, Robert Regep, was present during Plaintiff's post-discplinary hearing. PR ¶ 54. Regep did not participate in the vote regarding whether to uphold Plaintiff's demotion because he was absent from the subsequent board meeting during which the vote was taken. PR ¶ 54. Regep had no knowledge that Plaintiff supported Robison in the 2005 mayoral election. PR ¶ 54.

support of Ronald Robison in the April 2005 mayoral election. Defendants assert that Plaintiff has failed to establish sufficient evidence to create a triable issue of fact on this claim.

To make out a First Amendment claim for political retaliation in the employment context, a plaintiff must first present evidence that 1) his speech was constitutionally protected, and 2) that the speech played at least a substantial or motivating part in the employer's decision to take an adverse employment action. *Hall v. Babb,* 389 F.3d 758, 762 (7th Cir. 2004). If the plaintiff can make a *prima facie* showing, then the burden shifts to the defendant to demonstrate a legitimate, non-political reason for the employment decision. *Id.* It is not enough for the plaintiff to show only that he was of a different political persuasion than the decision makers. *Id.* Plaintiff must present specific evidence that the decision makers knew of his political affiliation, and took action against him because of it. *Id.* at 762-63. Plaintiff cannot rely on speculation or opinions of non-decision makers as proof that the defendant took action against him because of his political affiliation. *Nelms v. Modisett,* 153 F. 3d 815, 819 (7th Cir. 1998).

Moreover, a plaintiff alleging retaliation cannot demonstrate causation by suspicious timing alone. *Kampmier v. Emeritus Corp.,* 472 F.3d 930, 939-40 (7th Cir. 2007) (four to five month span between complaints of harassment and termination were insufficient to establish causal link); *Roger Whitmore's Automotive Services, Inc. v. Lake County,* 424 F.3d 659, 669 (7th Cir. 2005) (plaintiff's claim of suspicious timing relating to his loss in towing territory did not prove his claim of political retaliation where political support for the candidate was in early 1998, and the loss of territory occurred in April of 1999). The Seventh Circuit decisions which have addressed claims of political retaliation are instructive. In *Nelms,* the plaintiff, a field

investigator in the Office of the Attorney General, alleged that he was terminated based on his political association. *Nelms,* 153 F.3d at 816-17. In support of his claim, the plaintiff presented evidence that he was a Republican, and was terminated after a Democratic administration came into power. *Id.* at 817-18. The plaintiff also presented evidence that when he was fired, one of the decision makers said, in response to his inquiry as to why he was terminated, "you understand political realities." *Id.* at 817. He also presented evidence of statements by his co-worker and supervisor referring to his political affiliation and his termination. *Id.* at 818. The Seventh Circuit held that the plaintiff did not create a *prima facie* case of political retaliation because he could not rely on the speculation or opinions of non-decision makers. *Id.* at 819. The court did not find that the decision maker's statement to the plaintiff that "you understand political realities" to be an indication that the plaintiff was fired due to his political affiliation. *Id.* at 820. The court affirmed summary judgment for the defendants. *Id.* at 822.

A.      **Plaintiff has not Established a Prima Facie Case of Politically Motivated Discharge**.

Because Plaintiff's political support for Ronald Robison in the April 2005 mayoral election is constitutionally protected activity, the Court turns to the question of whether Plaintiff has demonstrated that Defendants were motivated, at least in part, by that conduct to demote him. *Nelms,* 153 F.3d at 819. In order to prove that Defendants were motivated by Plaintiff's political support, Plaintiff must first prove that Defendants in fact knew of his political support. *Id; See also Healy v. City of Chicago,* 450 F.3d 732, 740 (7th Cir. 2006) (decision maker must have actual knowledge of protected activity for decisions to be retaliatory). A plaintiff's failure to offer evidence that a majority of the hiring committee knew of the plaintiff's political

background dooms his case for political retaliation against them. *See Hall,* 389 F.3d at 762-63.

### 1. A Majority of the Village Board of Trustees Did Not Know of Plaintiff's Political Support for Robison.

Plaintiff has presented evidence that Defendant DuBois was aware of Plaintiff's support for Robison. But Plaintiff has failed to demonstrate that a majority of the Trustees who supported his demotion were aware of this support. Four Trustees participated in the unanimous vote to demote Plaintiff, and three of those Trustees were not aware of Plaintiff's political support for Robison. The only Trustee who was aware was also a supporter of Robison. Although Plaintiff has alleged that he expressed his support for Robison at various times, he has not presented any evidence to contradict the Trustee's statements that they were not aware of his support. Rather, any claim that the Trustees did know of his support is based on speculation.

### 2. Plaintiff Has Not Presented Sufficient Evidence to Prove That His Demotion was Politically Motivated.

Regardless, even if the Trustees were aware of Plaintiff's political support, his political retaliation claim still fails because Plaintiff has not presented sufficient evidence to support a finding that Defendants' decision to demote Plaintiff was politically motivated. *See Nelms,* 153 F.3d at 819. Plaintiff asserts that the following serve as sufficient evidence to support his claims that Defendants' demotion of Plaintiff was politically motivated: 1) the difficulties Chief DuBois faced with President Robison and the Plaintiff's strong support of Robison; 2) the ordering of Plaintiff out of the Village residential area on the day of the election; 3) the issuance of the April 7, 2005 report by Sergeant Raineri two days after the election; 4) the timeline of Sergeant Raineri's investigation; and 5) the circumstances in which Chief DuBois brought his

three charges.

As for Chief DuBois' relationship with Robison and Plaintiff's support for Robison, Plaintiff cannot satisfy his burden merely by showing that he supported someone who Chief DuBois did not support. *Hall,* 389 F.3d at 762. Even if Chief DuBois was the sole decision maker in Plaintiff's demotion, such evidence would not be sufficient to demonstrate political retaliation.

Plaintiff also argues that the fact that Chief DuBois ordered him out of the Village residential area on the day of the election supports his claim that his demotion was politically motivated. According to the Village Employee Manual, Bedford Park employees are prohibited from participating in political campaigning while on duty.

Plaintiff appears to rely most heavily on the fact that Sergeant Raineri issued a report regarding his investigations of the Juvenile Division records just two days after the mayoral election to support his claim of political retaliation. According to Defendants, this report, along with Sergeant Raineri's December 9, 2005 report, provided the basis for Defendant Dubois' decision to double demote Plaintiff, and the Village Board's decision to affirm that demotion. However, the only evidence of a connection between the issuance of the April 7, 2005 report and the April 5, 2005 election is the fact that the events took place within two days of each other.

An examination of the timing of events reveals that Plaintiff is relying on suspicions, not facts. Deputy Chief Wahl ordered Raineri to begin his investigation in May, 2004, more than six months before either Robison or Brady announced their candidacy for mayor, and more than

ten months before the April, 2005 election. Between July, 2004 and September, 2004, Sergeant Raineri submitted multiple memos regarding his investigation. Although Ranieri tendered his initial detailed report on April 7, 2005, DuBois did not ask him to verify the report until September, 2005. Ranieri did not tender a final report until January, 2006. This sequence of events does not support a claim of retaliation. *Kampier,* 472 F.3d at 940 (four to five month time lag between complaints of harassment and termination were insufficient to establish cause); *Mullin v. Gettinger*, 450 F.3d 280, 285 (7th Cir. 2006) (the time gap between the protected speech and the adverse employment action was "too attenuated to provide evidence"); *Oest v. Illinois Dept. Of Corrections*, 240 F.3d 605, 616 (7th Cir. 2001) ("The inference of causation weakens as the time between the protected expression and the adverse action increases, and then 'additional proof of a causal nexus is necessary.'")

Moreover, even when considering all of these incidents together, Plaintiff's assertion that these incidents are related to his demotion, and demonstrate that his demotion was politically motivated, is unsupported by the evidence. Chief DuBois did not demote Plaintiff until February 2006, almost a whole year after the mayoral election. The Village Board and President did not affirm that demotion until May 2006, over a year after the mayoral election. Plaintiff has failed to demonstrate any additional evidence sufficient to support his claim that the demotion was politically motivated.

Even in cases where the plaintiff has put forth more evidence than in this case, the Seventh Circuit has held that a plaintiff failed to demonstrate sufficient evidence to support his political retaliation claim. *See Nelms,* 1534 F.3d 815 (finding that one statement made by the

decision maker and other statements made by co-workers and the plaintiff's supervisor, all regarding the connection between plaintiff's political affiliation and his termination, did not demonstrate sufficient evidence to survive summary judgment on plaintiff's political retaliation claim). Only in cases where a plaintiff has put forth significantly more evidence to support his claim has the Seventh Circuit found that a plaintiff has demonstrated sufficient evidence to survive summary judgment. *See Felton v. Bd. of Comm'rs of Greene County,* 5 F.3d 198 (7th Cir. 1993) (finding that the Board of Commissioners unlawfully considered political affiliation where the evidence revealed that the decision makers had a long-standing practice of relying on political affiliation in staffing positions, and that the Democratic decision makers decided to fill the position with a democrat and advised the democrat of this decision significantly before a formal vote had occurred).

In *Nekolny v. Painter,* for example, the court held that the plaintiffs met their burden of demonstrating that their termination was politically motivated where the plaintiffs put forth direct evidence which revealed the motivation for plaintiff's termination. 653 F.2d 1164 (7th Cir. 1981). The plaintiffs put forth a statement by the defendant's assistant informing the plaintiffs that they were losing their jobs because they had worked against the defendant in the election. *Id.* at 1168. Unlike this case, the evidence in *Nekolny* went beyond the plaintiffs and defendants belonging to different political parties and suspicious timing and provided direct evidence of the defendant's motivation for firing the plaintiff. *Id.* Plaintiff in this case offers no such evidence.

And finally, any argument that the investigations were caused by Plaintiff's "heated

discussion" with DuBois about Robison is speculative and too tenuous to be relevant. The investigations into the juvenile record-keeping began over six months after the "heated discussion" occurred, and any relation between the two is based on pure speculation. Plaintiff has offered no evidence to demonstrate that the discussion was related to the investigations into the juvenile records, nor has he offered any evidence that the decision to investigate the records was motivated by Plaintiff's political support for Robison.

**B.     Even if Plaintiff had Established a Prima Facie case, Defendants Provided a Legitimate, Non-Political Reason for his Termination.**

Even if Plaintiff had established a prima facie case, Defendants have produced a legitimate, nonpolitical reason for their decision to demote Plaintiff, and thus summary judgment is still warranted. As indicated in the letter received by Plaintiff regarding the Board's decision, after conducting a hearing on the issue, the Village President and the Board unanimously voted to sustain Plaintiff's demotion based on their finding that Plaintiff failed to maintain the juvenile records from 2000 through 2004. They also based their decision on their finding that he failed to adequately ensure that officers in the juvenile division followed record-keeping procedures. The Board also found that the department supervisor's investigation was thorough, fair, and impartial, and that the disciplinary action imposed was justified and warranted.

The memos and reports issued by Sergeant Raineri regarding the juvenile record-keeping while under Plaintiff's supervision support the Board's decision. Although Plaintiff may disagree with the Board's decision, the Board decided to sustain Plaintiff's demotion based on

legitimate, non-political reasons. *Hall,* 389 F.3d at 762. Plaintiff has put forth no direct evidence to contradict these reasons. *See Nekolny,* 653 F.2d at 1168 (where plaintiff put forth direct evidence proving the defendants did not base their decision to terminate the plaintiff on a legitimate, non-political reason).

**C.     Plaintiff's *Monell* Claim Fails Because the Village Board, not Chief DuBois, Had Final Policymaking Authority over the Decision to Demote Plaintiff.**

Plaintiff also argues that, even if the Court finds that the Village's Board's actions were not politically motivated, Defendant Bedford Park can still be held liable for Defendant DuBois' actions under *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 694 (1978). A municipality may be held liable under 42 U.S.C. 1983 if there is a deprivation of constitutional rights caused by a municipal policy or custom. *Monell,* 436 U.S. at 694. To establish a policy or custom, a plaintiff may allege: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Gable v. City of Chicago,* 296 F.3d 531, 537 (7th Cir. 2002). Plaintiff alleges that DuBois was the final policymaker for purposes of Section 1983, or alternatively, that the Board delegated policymaking authority to him or ratified an allegedly unconstitutional act.

In order to have final policymaking authority, an official must possess "[r]esponsibility for making law or setting policy," that is, "authority to adopt rules for the conduct of government." *Auriemma v. Rice,* 957 F.2d 397, 401 (7th Cir. 1992). In its attempt to delineate

the type of activities which would constitute "the authority to adopt rules for government conduct," the court in *Auriemma* distinguished between legislative functions and executive ones. *Id.* An individual who exercises legislative authority to adopt rules for the conduct of government rather than one who merely exercises executive authority to implement them is the final policymaking authority. *Id.* The task is to determine whether the official in question was a final policymaker for the local government in a particular area, or on a particular issue. *Kujawski v. Bd. of Comm'rs,* 183 F.3d 734, 738 (7th Cir. 1999).

When an official's discretionary decisions are constrained by municipal policies not of that official's making, those policies, rather than the subordinate's departure from them, are the act of the municipality. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 126 (1988). If the authorized policymakers approve a subordinate's decision and the basis for it, the act is chargeable to the municipality. *Id.* One is a final policy-maker only if the official who commits the alleged violation of the plaintiff's rights has final authority in the sense that there is no higher authority. *Gernetzke v. Kenosha Unified School Dist. No. 1,* 274 F.3d 464, 469 (7th Cir. 2001). Administrators are not final policymakers for purposes of Section 1983 when their actions are constrained by rules and policies of a higher power. *See Brandt v. Bd. of Educ. of City of Chicago,* 420 F. Supp. 2d 921 (7th Cir. 2006); *Hill v. Cook County,* 2007 U.S. Dist. LEXIS 18962 (N.D. Ill. 2007). An individual's status as a final policymaker under section 1983 is a question of state or local law. *Killinger v. Johnson,* 389 F.3d 765 (7th Cir. 2004).

Even if the Court found that Chief DuBois' actions were politically motivated, Plaintiff would still not have a valid *Monell* claim against Defendant Bedford Park because DuBois was

not the final policymaker. Village Ordinance 9-1-4(c), states as follows:

> The police chief is hereby authorized to establish and execute such regulations and procedures within the department so as to effectively administer his responsibilities dealing with promotions, suspensions, layoffs, demotions, dismissal, wage increases and other personnel policies and procedures. This authorization shall be in conformance with the provisions set forth in said "personnel ordinance" and the provisions contained in administration, regulations, and standard operating procedure of the village, which is incorporated herein and made a part of this chapter by reference.

The Village ordinances also state that "the department shall be under the control and supervision of the police chief, who shall be the executive officer of the police department. He shall be responsible to the president and the board of trustees for the efficient operation of the department" and that the Chief's responsibilities for dealing with demotions shall conform with the provisions set forth in the personnel ordinance. PR ¶ 56; Vill. Ord. 9-1-2, 9-1-3, 9-1-4. The Village of Bedford Park personnel ordinance contains a policy relating to appeals of employee discplinary actions. Pl. Ex. 19, Ord. 1-18-6(D), Ord. 1-18-8(D)(1)(c)(1). Pursuant to the policy, suspensions or demotions may be appealed. PR ¶ 57. If appealed, "the village board, including the village president, . . . render[s] a final decision as to the grievant's petition." Pl. Ex. 19, Ord. 1-16-8(D)(1)(c)(1).

The Village ordinances make clear that the final authority with respect to an employee's disciplinary action rests with the Village Board, not the police chief. Plaintiff argues that the police chief possesses "legislative authority" because he is authorized to establish and execute regulations and procedures regarding demotions. However, the police chief's authority to do so is limited, in that it must conform to the provisions set forth in the other Village ordinances

and regulations, which are presumably enacted by the Village Board. Moreover, any decisions that the police chief does make with respect to demotions may be appealed to the Village Board. Thus, although the police chief possesses some authority to carry out regulations, the Village Board is the final policymaking authority on any decisions that the Police Chief may make. Regarding Plaintiff's alternative argument, the Court sees no evidence to support Plaintiff's contention that the Village President and the Board delegated their authority to DuBois.

Furthermore, the Village of Bedford Park personnel ordinance personnel policy provides that employment "shall be based on merit and fitness, and without regard for political . . . considerations." Def. Ex. 19, Ord. 1-18-2(A). This represents the official policy for *Monell* purposes. *Praprotnik,* 485 U.S. at 126. ("In the case before us, for example, it appears that the Mayor and Aldermen are authorized to adopt such ordinances relating to personnel administration as are compatible with the City Charter."). Chief DuBois was neither authorized nor delegated authority to alter that policy.

## V.  CONCLUSION

Therefore, for the reasons set forth in this opinion, the Defendants' Motion to Strike and Deem Admitted Certain Paragraphs of Plaintiff's Local Rule 56.1 Statement of Additional Material Facts is granted in part and denied in part and Defendants' Motion for Summary Judgment on Count I of Plaintiff's Second Amended Complaint is granted.

SO ORDERED THIS 5th DAY OF JUNE, 2008.

_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**

Mark C. Egan
3849 West 109th Street
Chicago, IL 60655

Kenneth C. Yuen
1425 West Schaumburg Road
Suite 302
Schaumburg, IL 60194

**Counsel for Plaintiff**

Robert Radasevich
Neal, Gerber & Eisenberg
Two North LaSalle Street
Suite 2200
Chicago, IL 60602

**Counsel for Defendant Lee J. DuBois**

Jane M. May
O'Halloran, Kosoff, Geitner & Cook, LLC
650 Dundee Road
Suite 475
Northbrook, IL 60062

**Counsel for Defendant
Village of Bedford Park**